# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: | Case No. 18-32482 |
| Janette Lee Fairbanks, | Chapter 13 Bankruptcy |
| Debtor. | |

# OBJECTION OF NJC HOLDINGS LLC
# TO CONFIRMATION OF PLAN

NJC Holdings LLC, a creditor in this matter, by and through its undersigned counsel, hereby objects to confirmation of Debtor's Chapter 13 Plan (the "Plan"), on numerous grounds, including, but not limited to, 11 U.S.C. §§ 1324(a), 1325, Bankruptcy Rule 3015(f), and Local Rule 3015-3. The Debtor's Plan is scheduled for confirmation in this Court on October 25, 2018 at 10:30 a.m.

The Plan is not in the best interests of the creditors and violates the requirements of the bankruptcy code Section 1322(b)(2). The Plan improperly describes amounts due on a matured home mortgage as amounts due to cure a default under Section 1322(b)(5). That section, however, concerns a secured claim that matures after final payment under the Plan is due and is not applicable in this case. Even if amounts due on a matured home mortgage fall under this section, the Plan is not in the best interests of the creditors because it does not provide for payment of the correct amount, does not provide for payment within a reasonable time, and is not feasible. Accordingly, the Plan should be rejected.

## BACKGROUND

NJC Holdings LLC ("NJC") is a creditor in this matter by virtue of a loan secured by a mortgage on Debtor's homestead, commonly known as 1112 Breen St., Saint Paul, MN 55106 (the "Property").

## I.    THE LOAN AND THE MORTGAGE

Debtor accepted a loan from Platinum Bank on July 30, 2012 in the principal amount of $16,500.  (Credit Agreement and Disclosure, July 30, 2012, Ex. 1 to Decl. of Thomas J. Flynn, Oct. 18, 2018 [hereinafter "Flynn Decl."].)  The loan was to mature on July 30, 2016.  *Id.*  As collateral to secure the loan, Debtor gave a mortgage lien to Platinum Bank on July 30, 2012 (the "Mortgage").  (Mortgage, July 30, 2012, Ex. 2 to Flynn Decl.)  The Mortgage was recorded on August 30, 2012.

Debtor promised to pay Platinum Bank the total of all credit advances and finance charges, together will all costs and expenses for which Debtor is responsible under the Credit Agreement or Mortgage.  (Credit Agreement and Disclosure, July 30, 2012, Ex. 1 to Flynn Decl.)  Debtor agreed to pay finance charges monthly, over the course of the 60-month loan.  *Id.*  In addition, Debtor agreed that the full amount of the loan would be payable in full upon the maturity date in a single balloon payment, and Debtor would pay the entire outstanding principal, interest and any other charges then due.  *Id.*

On July 30, 2016, Debtor and Platinum Bank entered into a Modification of Mortgage modifying the maturity date of the original Mortgage, and extending the maturity date to July 30, 2017.  (Modification of Mortgage, July 30, 2016, Ex. 3 to

Flynn Decl.)  The Modification of Mortgage was recorded on October 19, 2016.

Debtor and Platinum Bank entered into a Credit Agreement and Disclosure Change

in Terms Agreement to document the new maturity date, which also expressly

acknowledged the continuing validity of all other terms of the original Credit

Agreement and Disclosure.  (Credit Agreement and Disclosure Change in Terms

Agreement, July 30, 2016, Ex. 4 to Flynn Decl.)  On July 30, 2017, the loan and

mortgage lien matured.  At that time there was a principal balance of $16,022.58

still due on the loan, along with interest, attorneys' fees and costs.

NJC took assignment of the mortgage lien from Platinum Bank for good and

valuable consideration on September 27, 2017.  (Assignment of Mortgage, Sept. 27,

2017, Ex. 5 to Flynn Decl.)  The Assignment of Mortgage was recorded on

November 14, 2017.  When Debtor failed to pay real estate taxes on the Property, in

accordance with the Mortgage, as modified, NJC paid $9,358.78 in taxes to keep the

Property free of tax encumbrances.  (See NJC's Proof of Claim, Oct. 8, 2018, Claim

No. 1, on file with the Court.)

As of August 31, 2018, Debtor owed NJC $32,502.24 on the mortgage lien,

including interest, attorneys' fees and costs, which continue to accrue.  (See NJC's

Proof of Claim, Claim No. 1.)

II.     THE CHAPTER 13 FILING AND THE PLAN

Debtor filed her Chapter 13 voluntary petition on August 5, 2018.  (Doc. 1.)

Debtor's initial Plan proposed total payment of $25,800 under Part 7 for Home

Mortgages in Default.  (Doc. 11.)  Debtor proposed a 36-month payment Plan

wherein, beginning in month 5, payments of $806.25 per month are made to NJC as repayment of the matured loan and Mortgage. *Id.*

NJC now objects to confirmation of the Plan.

## ARGUMENT

NJC objects to the Plan for four reasons.  First, NJC's secured claim concerns a mortgage that matured before Debtor filed her Chapter 13 petition, not a secured claim for which payments will continue to be due after the date on which the final payment under the Plan will be due.  Accordingly, it is mischaracterized in the Plan.  Second, the Plan does not propose to pay the value due under the Mortgage to NJC.  Third, the Plan does not propose to pay NJC within a reasonable time.  And finally, Debtors' payment of the indebtedness is not feasible.

I.   DEBTOR'S PROPOSED PLAN INAPPROPRIATELY CATEGORIZES NJC'S CLAIM

Debtor's Plan, at Part 7, provides for payment of a "default" on the Mortgage to NJC in the amount of $25,800.  (Doc. 11.)  The Plan inappropriately includes NJC's Mortgage under Part 7.

Pursuant to 11 U.S.C. § 1332(b)(5), the contents of the Plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any […] secured claim on which the last payment is due after the date on which the final payment under the Plan is due." (11 U.S.C. § 1332(b)(5) (emphasis added).)  Clearly, this section does not provide for curing a default of a matured mortgage, such as the Mortgage owed to NJC here.  Case law supports that this section is intended to allow a debtor's Plan to provides for "cure

and maintain[ing] payments for long term debt," not for payment of fully matured

debts.  See *In Re Heinzle*, 511 B.R. 69, 80 (W.D. Tex. 2014).  Section 1322(b)(5)

allows a debtor to "cure a pre-petition mortgage delinquency through the Plan, but

[the debtor] must do so by also staying current on their mortgage." *In Re Heinzle*,

511 B.R. at 80.

## II.    DEBTOR'S PROPOSED PLAN INCORRECT CALCULATES AMOUNTS DUE TO NJC.

In addition, and as demonstrated by NJC's Proof of Claim, the amount owed

to NJC is substantially more than the $25,800 articulated in the proposed Plan.

(Doc. 1; NJC Proof of Claim, Claim No. 1.)  Pursuant to 11 U.S.C. § 1322(e), even if

the Mortgage interest is correctly accounted for in Part 7, which it is not, it is

incorrectly calculated.  "[I]f it is proposed in a Plan to cure a default, the amount

necessary to cure the default, shall be determined in accordance with the

underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1322(e).

The $25,800 proposed in the Plan does not accurately reflect the principal, interest,

attorneys' fees and costs, and additional expenditures for which Debtor is obligated

to pay NJC under the Mortgage and the Credit Agreement and Disclosure.  (See

NJC Proof of Claim, Claim No. 1.)

## III.   DEBTOR'S PROPOSED THREE-YEAR PAYMENT PLAN INAPPROPRIATELY EXTENDS THE LOAN AND MORTGAGE

Finally, even if the Mortgage interest is correctly accounted for in Part 7,

which it is not, Debtor proposed to pay the value of the mature Mortgage over a 36-

month period.  (Doc. 11.)  Pursuant to 11 U.S.C. § 1322(b)(5), the Plan may "provide

for the curing of a default within a *reasonable time*." 11. U.S.C. § 1322(b)(5)

(emphasis added).  "[C]ases uniformly hold that a 'reasonable time' under 11 U.S.C. Section 1322(b)(5) is a flexible concept and that whether a Plan's proposal to cure an arrearage is reasonable must be determined on a case-by-case basis and under the facts and equities of each case, such determination being within the sound discretion of the court."  *In re Chavez*, 117 B.R. 730, 731-32 (S.D. Fla. 1990). Minnesota has established a rebuttable presumption that a cure period in excess of 12 months is unreasonable.  *In re Newton*, 161 B.R. 207 (D. Minn. 1993).  Under the circumstances of this case, 36 months is not a reasonable time to cure, and Debtor cannot rebut that presumption.  The list of factors courts consider in determining reasonableness of a cure period includes past payment history on the debt at issue, total length of repayment under an applicable contract, the reason for arrearages, nature of collateral, and whether or not the debtor is putting forth their best effort to cure.  See, e.g., *In re Ford*, 221 B.R. 749 (W.D. Tenn. 1998); see also *In re Newton*, 161 B.R. 207 (evaluating whether proposed cure period is so great as to alter prior allocation of risk).

Thirty-six months is an entirely unreasonable period in light of the fact that the mortgage is fully matured, and no continuing payments are due.  Debtor agreed to pay monthly finance charges during the term of the loan, and then pay the remainder as a balloon payment immediately upon maturity.  The Mortgage and loan matured on July 30, 2017, but Debtor did not pay.  Debtor has not made payments in the 14-and-a-half months since July 30, 2017.  The debt is secured by the Property, however, even if Debtor is putting forth her best effort to cure under

6.

the proposed Plan, it is unreasonable to allow Debtor three additional years to

satisfy its obligations to NJC when Debtor promised it would do so immediately

upon maturation of the Mortgage.

IV.    DEBTOR'S PAYMENT OF THE INDEBTEDNESS IS NOT FEASIBLE.

Section 1325(a)(6) requires consideration of all of Debtor's legitimate

expenses in making the feasibility determination.  *In re Corbo*, 391 B.R. 617, 622

(D. Minn. 2008).  "The debtor must be able to afford [their] proposed Plan payments

above and beyond being able to satisfy all of [their] other minimal and permissible

legal obligations."  *Id.*  Here, Debtor's proposed Plan is entirely unfeasible.

Debtor proposes to pay the trustee $900 per month for 36 months.  Just prior

to the time of her petition, Debtor acknowledged that she has not been employed

during the 60 days preceding filing her petition.  (Doc. 4; see also Doc. 10.)  She does

not have any income from employment.  (Doc. 10.)  Debtor has only $3,331.00 of

personal property, most of which is claimed exempt.  (Doc. 10.)  She has claimed

income of $1,755.47 per month – $1,500 of rental income from adult children, and

$255.47 from unemployment – and monthly expenses of $855. (Doc. 10.)  This leaves

exactly $900.47 of otherwise disposable income, all but 47 cents of which, monthly,

she intends to pay the trustee pursuant to the Plan.  This Plan does not account for

<u>any</u> medical or dental expenses, <u>any</u> transportation expenses, or <u>any</u> life, health, or

vehicle insurance (despite listing two vehicles as assets).  (Doc. 10.)

Additionally, Debtor only includes $150.00 per month for real estate taxes for

the Property at 1112 Breen Street.  (Doc. 10.)  This would amount to only $1,800.00

annually, despite the 2018 real estate taxes on the Property totaling $2,100, <u>before</u>

7.

penalties and fees.  (Ramsey County Property Tax Public Record, October 17, 2018,

Ex. 6 to Flynn Decl.)  Debtor has already incurred $84.00 for failing to timely pay

her first-half 2018 taxes.  It is entirely unclear how Debtor could make the proposed

payments.  Even if Debtor's schedules are otherwise accurate, and she incurs no

medical or dental expenses, no transportation expenses, and no life, healthy, or

vehicle insurance costs, she will be unable to pay the actual real estate taxes on the

Property and maintain her payments under the proposed Plan.

## CONCLUSION

Debtor's Plan should be rejected.  The Plan improperly describes amounts

due on a matured home mortgage as a secured claim which matures after final

payment under the Plan is due.  The full amount of the Mortgage has been due

since July 30, 2017, over a year before Debtor filed her Chapter 13 petition.  Even if

amounts due on the Mortgage fall under this section, the Plan does not provide for

payment of the correct amount, does not provide for payment within a reasonable

time, and is entirely unfeasible.  For these reasons, NJC objects to the proposed

Plan.

## RESERVATION OF RIGHT TO WITNESSES

Pursuant to Local Rule 9013-2(c), NJC states that, should testimony be

necessary on this matter, NJC reserves the right to call the following witnesses:

1.  Paul Bruggeman, principal of creditor NJC; and

2.  Other witnesses needed to rebut the testimony of any adverse party.

Respectfully submitted,

Dated:  October 18, 2018

By:   */s/ Thomas J. Flynn*

Thomas J. Flynn (030570)
Larkin Hoffman Daly & Lindgren, Ltd.
8300 Norman Center Drive
Suite 1000
Minneapolis, Minnesota  55437-1060
(952) 835-3800
tflynn@larkinhoffman.com

*Attorneys for NJC Holdings LLC*

4848-2793-2024, v. 1

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MINNESOTA

In re:                                    Case No. 18-32482

Janette Lee Fairbanks,                    Chapter 13 Bankruptcy

    Debtor.

## DECLARATION OF THOMAS J. FLYNN IN SUPPORT OF THE OBJECTION OF NJC HOLDINGS LLC TO CONFIRMATION OF PLAN

STATE OF MINNESOTA            )

                              )      ss.

COUNTY OF HENNEPIN            )

1.      I am an attorney with Larkin Hoffman Daly & Lindgren, Ltd., the law firm representing creditor NJC Holdings LLC in this bankruptcy case.  Except where otherwise indicated, I make this declaration upon my own personal knowledge.

2.      Attached as **Exhibit 1** is a true and correct copy of the Credit Agreement and Disclosure, July 30, 2012.

3.      Attached as **Exhibit 2** is a true and correct copy of the Mortgage, July 30, 2012, recorded August 30, 2012 as document number 4354341 in the Office of the County Recorder in and for Ramsey County, MN.

4.      Attached as **Exhibit 3** is a true and correct copy of the Modification of Mortgage, July 30, 2016, recorded October 19, 2016 as document number A04629633 in the Office of the county Recorder in and for Ramsey County, MN.

5.      Attached as **Exhibit 4** is a true and correct copy of the Credit Agreement and Disclosure Change in Terms Agreement, July 30, 2016.

6.      Attached as **Exhibit 5** is a true and correct copy of the Assignment of Mortgage, Sept. 27, 2017, recorded November 14, 2017 as document number A04685814 in the Office of the County Recorder in and for Ramsey County, MN.

7.      Attached as **Exhibit 6** is a true and correct copy of the Ramsey County Property Tax Public Record for Debtor's property at 1112 Breen Street, St. Paul, MN, as accessed October 17, 2018.

I declare under penalty of perjury that everything I have stated in this document is true and correct.  Executed on October 18, 2018, in Hennepin County, Minnesota.

_/s/ Thomas J. Flynn_
Thomas J. Flynn

4844-0333-5544, v. 1

## CREDIT AGREEMENT AND DISCLOSURE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $16,500.00 | 07-30-2012 | 07-30-2016 | 8001826 | | | KMK | |

References in the boxes above are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing " * * * " has been omitted due to text length limitations.

Borrower:   Janette L Fairbanks
1112 Breen St
Saint Paul, MN  55106

Lender:   Platinum Bank
Main office
7667 10th St N
Oakdale, MN  55128

**CREDIT LIMIT:  $16,500.00**                    **DATE OF AGREEMENT: July 30, 2012**

**Introduction.** This Credit Agreement and Disclosure ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through Platinum Bank. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean Platinum Bank. **You agree to the following terms and conditions:**

**Promise to Pay.** You promise to pay Platinum Bank, or order, the total of all credit advances and **FINANCE CHARGES**, together with all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is jointly and severally liable on this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until July 30, 2016 ("Maturity Date"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity. The draw period of your Credit Line will begin on August 3, 2012 (the "Effective Disbursement Date") and will continue as follows:  60 months. You may obtain credit advances during this period ("Draw Period"). You agree that we may renew or extend the period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.** Your "Regular Payment" will equal the amount of your accrued **FINANCE CHARGES**. You will make 59 of these payments. You will then be required to pay the entire balance owing in a single balloon payment. If you make only the minimum payments, you may not repay any of the principal balance by the end of this payment stream. Your payments will be due monthly. Your "Minimum Payment" will be the Regular Payment, plus any amount past due and all other charges. An increase in the **ANNUAL PERCENTAGE RATE** may increase the amount of your Regular Payment. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement.

**Balloon Payment.** Your Credit Line Account is payable in full upon maturity in a single balloon payment. You must pay the entire outstanding principal, interest and any other charges then due. Unless otherwise required by applicable law, we are under no obligation to refinance the balloon payment at that time. You may be required to make payments out of other assets you own or find a lender, which may be us, willing to lend you the money. If you refinance the balloon payment, you may have to pay some or all of the closing costs normally associated with a new credit line account, even if you obtain refinancing from us.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied first to Finance Charges; then to unpaid principal; and then to late charges and other charges.

**Receipt of Payments.** All payments must be made in U.S. dollars and must be received by us consistent with any payment instructions provided on or with your periodic billing statement. If a payment is made consistent with our payment instructions but received after 5:00 PM on a business day, we will apply your payment to your Credit Line on the next business day.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Sixteen Thousand Five Hundred & 00/100 Dollars ($16,500.00), which will be your "Credit Limit" under this Agreement. **During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights.** You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Mortgage covering your principal dwelling.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Mortgage or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Mortgage for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** Beginning on the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

**Credit Line Checks.** Writing a preprinted "Platinum Bank Check" that we will supply to you.

**Telephone Request.** Requesting a credit advance from your Credit Line to your designated account by telephone. Except for transactions covered by the federal Electronic Fund Transfers Act and unless otherwise agreed in your deposit account agreement, you acknowledge and you agree that we do not accept responsibility for the authenticity of telephone instructions and that we will not be liable for any loss, expense, or cost arising out of any telephone request, including any fraudulent or unauthorized telephone request, when acting upon such instructions believed to be genuine.

**Overdrafts.** Writing a check on your designated checking account with us in excess of the available collected balance in the account.

**Requests By Mail.** Requesting an advance by mail.

## CREDIT AGREEMENT AND DISCLOSURE

Loan No: 8001826        (Continued)        Page 2

**Requests in Person.** Requesting a credit advance in person at any of our authorized locations.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one Borrower telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor Platinum Bank Checks in the following circumstances:

**Credit Limit Violation.** Your Credit Limit has been or would be exceeded by paying the Platinum Bank Check.

**Stolen Checks.** Your Platinum Bank Checks have been reported lost or stolen.

**Unauthorized Signatures.** Your Platinum Bank Check is not signed by an "Authorized Signer" as defined below.

**Termination or Suspension.** Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Platinum Bank Check.

If we pay any Platinum Bank Check under these conditions, you must repay us, subject to applicable laws, for the amount of the Platinum Bank Check. The Platinum Bank Check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return Platinum Bank Checks along with your periodic billing statements; however, your use of each Platinum Bank Check will be reflected on your periodic statement as a credit advance. We do not "certify" Platinum Bank Checks drawn on your Credit Line.

**Transaction Requirements.** The following transaction limitations will apply to the use of your Credit Line:

**Credit Line Platinum Bank Check, In Person Request, Telephone Request, Overdraft and Request By Mail Limitations.** There are no transaction limitations for the writing of Platinum Bank Checks, requesting an advance in person, requesting an advance by telephone, writing a check in excess of your checking account balance or requesting an advance by mail.

**Limitation on All Access Devices.** You may not use any access device, whether described above or added in the future, for any illegal or unlawful transaction, and we may decline to authorize any transaction that we believe poses an undue risk of illegality or unlawfulness. Notwithstanding the foregoing, we may collect on any debt arising out of any illegal or unlawful transaction.

**Authorized Signers.** The words "Authorized Signer" on Platinum Bank Checks as used in this Agreement mean and include each person who (a) signs the application for this Credit Line, (b) signs this Agreement, or (c) has executed a separate signature authorization card for the Credit Line Account.

**Lost Platinum Bank Checks.** If you lose your Platinum Bank Checks or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (651) 332-5200. You can also notify us at Platinum Bank 409 Hayward Avenue North, Oakdale, MN 55128.

**Future Credit Line Services.** Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

**Collateral.** You acknowledge this Agreement is secured by the following collateral described in the security instrument listed herein: a Mortgage dated July 30, 2012, to us on real property located in Ramsey County, State of Minnesota.

**Insurance.** You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

**Right of Setoff.** To the extent permitted by applicable law, we reserve a right of setoff in all your accounts with us (whether checking, savings, or some other account), including without limitation, all accounts you may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. You authorize us, to the extent permitted by applicable law, to charge or setoff all sums owing on this Agreement against any and all such accounts, and, at our option, to administratively freeze all such accounts to allow us to protect our charge and setoff rights provided in this paragraph.

**Periodic Statements.** If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement, unless prohibited by applicable law. It will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

**When FINANCE CHARGES Begin to Accrue.** Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit advances.

**Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed.** A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "daily balance" method. To get the daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances, and subtract any unpaid FINANCE CHARGES and any payments or credits. This gives us the "daily balance."

**Method of Determining the Amount of FINANCE CHARGE.** Any FINANCE CHARGE is determined by applying the "Periodic Rate" to the balance described herein. Then we add together the periodic FINANCE CHARGES for each day in the billing cycle. This is your FINANCE CHARGE calculated by applying a Periodic Rate.

You also agree to pay FINANCE CHARGES, not calculated by applying a Periodic Rate, as set forth below:

**Minimum FINANCE CHARGE.** In any event, including payment of the Credit Line balance in full, you may have to pay a Minimum FINANCE CHARGE of $25.00. This fee will be charged as follows: At Account Opening.

**Additional Finance Charges.** The following additional FINANCE CHARGES will be charged to your Credit Line or paid in cash:

| | | |
|---|---|---|
| Flood Certification: | Financed | $12.50 |
| Mortgage Recording-Land Title: | Financed | $20.00 |
| Satisfactin of Mortgage Recording-Land Title, Inc: | Financed | $20.00 |

## CREDIT AGREEMENT AND DISCLOSURE
### (Continued)

Loan No: 8001826                                                                                          Page 3

Periodic Rate and Corresponding **ANNUAL PERCENTAGE RATE.** We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent index which is the Prime Rate as published in the Wall Street Journal. When a range of rates have been published, the higher of the rates will be used (the "Index"). We will use the most recent Index value available to us as of the date of any ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Credit Line Account, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your account, we take the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Adjustments to the Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** resulting from changes in the Index will take effect monthly. In no event will the Periodic Rate result in a corresponding **ANNUAL PERCENTAGE RATE** that is less than 5.000% or more than 20.000%, nor will the Periodic Rate or corresponding **ANNUAL PERCENTAGE RATE** exceed the maximum rate allowed by applicable law. Today the Index is 3.250% per annum, and therefore the initial Periodic Rate and the corresponding **ANNUAL PERCENTAGE RATE** on your Credit Line are as stated below:

**Current Rates for the First Payment Stream**

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | 0.000% | 5.000% | 0.01370% |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period.

**Conversion Option.** This Agreement contains an option to convert the interest rate from a variable rate with interest rate limits to a fixed rate as calculated below. The following information describes the terms and features of the conversion option available under this Agreement:

**ANNUAL PERCENTAGE RATE Increase.** Your ANNUAL PERCENTAGE RATE may increase if you exercise this option to convert to a fixed rate.

**Conversion Periods.** You can exercise the option to convert to a fixed rate only during the following period or periods: As long as the loan is in good standing we will consider a conversion to a fixed rate.

**Conversion Fees.** You will be required to pay the following fees at the time of conversion to a fixed rate: At Lender's discretion.

**Rate Determination.** The fixed rate will be determined as follows: The prevailing Home Equity Term Rate available at the time of conversion.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line described below:

**Payment of Closing Costs.** If you elect to charge your Credit Line Account to pay the closing costs associated with your Credit Line (such as title insurance premiums, appraisal fees, credit report fees, and recording fees), the total of these charges will be reflected as "closing costs" on your first periodic billing statement.

**Returned Items.** You may be charged $35.00 if you pay your Credit Line obligations with a check, draft, or other item that is dishonored for any reason, unless applicable law requires a lower charge or prohibits any charge.

**Fee to Stop Payment.** Your Credit Line Account may be charged $30.00 when you request a stop payment on your account.

**Overlimit Charge.** Your Credit Line Account may be charged $20.00 if you cause your Credit Line Account to go over your Credit Limit. This includes writing a Platinum Bank Check in excess of your available balance.

**Late Charge.** Your payment will be late if it is not received by us within 10 days after the "Payment Due Date" shown on your periodic statement. If your payment is late we may charge you 5.000% of the unpaid amount of the payment.

**Security Interest Charges.** You agree to pay all security interest charges related to your Credit Line as set forth below:

| | |
|---|---|
| O&E-Land Title, Inc | $75.00 |
| Mortgage Recording-Ramsey County | $46.00 |
| Satisfaction of Mortgage Recording-Ramsey County | $46.00 |
| Ramsey MRT | $39.60 |
| Total | $206.60 |

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen: (1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition. (2) You do not meet the repayment terms of this Credit Agreement. (3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material

## CREDIT AGREEMENT AND DISCLOSURE
### (Continued)

change in your financial circumstances.

(3)  You are in default under any material obligations of this Credit Line Account.  We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker.

(4)  We are precluded by government action from imposing the **ANNUAL PERCENTAGE RATE** provided for under this Agreement.

(5)  The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6)  We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.**  We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems).  If the Index is no longer available, we will choose a new Index and margin.  The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an **ANNUAL PERCENTAGE RATE** that is substantially similar to the rate in effect at the time the original index becomes unavailable.  We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum **ANNUAL PERCENTAGE RATE** under your Credit Line Account is reached.

**Collection Costs.**  We may hire or pay someone else to help collect this Agreement if you do not pay.  You will pay us that amount.  This includes, subject to any limits under applicable law, our reasonable attorneys' fees and our legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.  If not prohibited by applicable law, you also will pay any court costs, in addition to all other sums provided by law.

**Rate Increase.**  In addition to our other rights during termination and acceleration, we may increase the variable **ANNUAL PERCENTAGE RATE** under this Agreement to 4.000 percentage points over the then applicable **ANNUAL PERCENTAGE RATE**.  The **ANNUAL PERCENTAGE RATE** will not exceed the maximum rate permitted by applicable law.  If we do not increase the **ANNUAL PERCENTAGE RATE** upon termination or acceleration of your Credit Line Account, it will continue at the variable rate in effect as of the date of termination or acceleration of your Credit Line Account.

**Access Devices.**  If your Credit Line is suspended or terminated, you must immediately return to us all Platinum Bank Checks and any other access devices.  Any use of Platinum Bank Checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of Platinum Bank Checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.**  We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right.  If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice.  For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

**Cancellation by you.**  If you cancel your right to credit advances under this Agreement, you must notify us in writing at the address shown on your periodic billing statement or other designated address and return all Platinum Bank Checks and any other access devices to us.  Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.**  You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive the Minimum **FINANCE CHARGES** as stated above and to receive all accrued **FINANCE CHARGES**, and other charges, if any.  Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments.  Instead, they will reduce the principal balance owed on the Credit Line.  You agree not to send us payments marked "paid in full", "without recourse", or similar language.  If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Platinum Bank, Main office, 7667 10th St N, Oakdale, MN  55128.  YOU HAVE BEEN ASSESSED FINANCE CHARGES, OR POINTS, WHICH ARE NOT INCLUDED IN THE ANNUAL PERCENTAGE RATE.  THESE CHARGES MAY BE REFUNDED, IN WHOLE OR IN PART, IF YOU DO NOT USE YOUR LINE OF CREDIT OR IF YOU REPAY YOUR LINE OF CREDIT EARLY.  THESE CHARGES INCREASE THE COST OF YOUR CREDIT.

**Notices.**  All notices will be sent to your address as shown in this Agreement.  Notices will be mailed to you at a different address if you give us written notice of a different address.  You agree to advise us promptly if you change your mailing address.

**Annual Review.**  You agree that you will provide us with a current financial statement, a new credit application, or both, annually, on forms provided by us.  Based upon this information we will conduct an annual review of your Credit Line Account.  You also agree we may obtain credit reports on you at any time, at our sole option and expense, for any reason, including but not limited to determining whether there has been an adverse change in your financial condition.  We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense.  You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law.

**Transfer or Assignment.**  Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Mortgage.  Your rights under this Agreement belong to you only and may not be transferred or assigned.  Your obligations, however, are binding on your heirs and legal representatives.  Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.**  You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible.  You should consult your own tax advisor for guidance on this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.**  Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency.  Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: Platinum Bank 7667 10th St N Oakdale, MN 55128.

**Governing Law.**  This Agreement will be governed by federal law applicable to us and, to the extent not preempted by federal law, the laws of

## CREDIT AGREEMENT AND DISCLOSURE
(Continued)

the State of Minnesota without regard to its conflicts of law provisions. This Agreement has been accepted by us in the State of Minnesota.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Mortgage, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also agree that you have received a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "What you should know about Home Equity Lines of Credit," given with the application.

**Section Disclosure.** To the extent not preempted by federal law, this loan is made under Minnesota Statutes, Section 47.59.


BORROWER:

X ___COPY_____
     Janette L Fairbanks


ACCEPTED: PLATINUM BANK

By: ___COPY_____
       Authorized Officer

CREDIT AGREEMENT AND DISCLOSURE
(Continued)

Loan No: 8001826

Page 6

## BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

    Your name and account number.

    The dollar amount of the suspected error.

    Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

LASER PRO Lending, Ver. 5.60.10.008  Copr. Harland Financial Solutions, Inc. 1997, 2012.  All Rights Reserved.  - MN  M:\HARLAND\CFI\LPL\D26.FC  TR-1C13  PR-8

# EXHIBIT 2

## MORTGAGE

**RECORDATION REQUESTED BY:**
Platinum Bank
Main office
7667 10th St N
Oakdale, MN  55128

**WHEN RECORDED MAIL TO:**
Platinum Bank
Main office
7667 10th St N
Oakdale, MN  55128

RETURN TO: MR 38135
LAND TITLE, INC.

**SEND TAX NOTICES TO:**
Platinum Bank
Main office
7667 10th St N
Oakdale, MN  55128

---

**MAXIMUM LIEN. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE MAXIMUM PRINCIPAL AMOUNT OF THE LINE OF CREDIT SECURED BY THIS MORTGAGE AT ANY ONE TIME IS $16,500.00.**

**THIS MORTGAGE** dated July 30, 2012, is made and executed between Janette L Fairbanks, as a single person (referred to below as "Grantor") and Platinum Bank, whose address is 7667 10th St N, Oakdale, MN  55128 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor mortgages and conveys to Lender, with power of sale, all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Ramsey County, State of Minnesota:

See See Exhibit A, which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

The Real Property or its address is commonly known as  1112 Breen St, Saint Paul, MN  55106.  The Real Property tax identification number is 27-29-22-11-0022.

**REVOLVING LINE OF CREDIT.** This Mortgage secures the Indebtedness including, without limitation, a revolving line of credit, under which advances, payments, and readvances may be made from time to time. The maximum amount of the line of credit which may be secured at any one time is $16,500.00.

In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property.

**THIS MORTGAGE, INCLUDING THE SECURITY INTEREST IN PERSONAL PROPERTY, IS GIVEN TO SECURE  (A)  PAYMENT OF THE INDEBTEDNESS AND  (B)  PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THE CREDIT AGREEMENT, THE RELATED DOCUMENTS, AND THIS MORTGAGE.  THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due and shall strictly perform all of Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.**  Grantor agrees that Grantor's possession and use of the Property shall be

## MORTGAGE
### (Continued)

governed by the following provisions:

**Possession and Use.**  Until the occurrence of an Event of Default, Grantor may  (1)  remain in possession and control of the Property; (2)  use, operate or manage the Property; and  (3)  collect the Rents from the Property.

**Duty to Maintain.**  Grantor shall maintain the Property in good condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.**  Grantor represents and warrants to Lender that:  (1)  During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property;  (2)  Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing,  (a)  any breach or violation of any Environmental Laws,  (b)  any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or  (c)  any actual or threatened litigation or claims of any kind by any person relating to such matters; and  (3)  Except as previously disclosed to and acknowledged by Lender in writing,  (a)  neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and  (b)  any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws.  Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage.  Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person.  The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances.  Grantor hereby  (1)  releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and  (2)  agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses, including attorneys' fees, consultants' fees, and costs which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor.  The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.**  Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property.  Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Grantor's prior written consent.

**Removal of Improvements.**  Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent.  As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.**  Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.**  Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property.  Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized.  Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.**  Grantor agrees neither to abandon or leave unattended the Property.  Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.**  Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property.  A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property.  However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Minnesota law.

**TAXES AND LIENS.**  The following provisions relating to the taxes and liens are part of this Mortgage:

**Payment.**  Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property.  Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for the Existing Indebtedness referred to in this Mortgage or those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.**  Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized.  If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the

## MORTGAGE
### (Continued)

filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the maximum amount of Grantor's credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds 5,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**LENDER'S EXPENDITURES.** If Grantor fails (A) to keep the Property free of all taxes, liens, security interests, encumbrances, and other claims, (B) to provide any required insurance on the Property, (C) to make repairs to the Property or to comply with any obligation to maintain Existing Indebtedness in good standing as required below, then Lender may do so. If any action or proceeding is commenced that would materially affect Lender's interests in the Property, then Lender on Grantor's behalf may, but is not required to, take any action that Lender believes to be appropriate to protect Lender's interests. All expenses incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of any default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in the Existing Indebtedness section below or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

## MORGAGE
(Continued)

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Promises.** All promises, agreements, and statements Grantor has made in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature and shall remain in full force and effect until such time as Grantor's Indebtedness is paid in full.

**EXISTING INDEBTEDNESS.** The following provisions concerning Existing Indebtedness are a part of this Mortgage:

**Existing Lien.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage, deed of trust, or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantor.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or

## MORTGAGE
### (Continued)

hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-In-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Grantor will be in default under this Mortgage if any of the following happen: (A) Grantor commits fraud or makes a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (B) Grantor does not meet the repayment terms of the Credit Agreement. (C) Grantor's action or inaction adversely affects the collateral or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Acceleration and Foreclosure.** Lender shall send a notice of default to Grantor by certified mail to the address of the mortgaged property or to such other address as Grantor has designated in writing to Lender. This notice shall provide the following information: (1) the nature of the default, (2) the action required to cure the default, (3) a date, not less than thirty (30) days from the date the notice is mailed, by which the default must be cured, (4) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by the mortgage and sale of the Property, (5) that Grantor has the right to reinstate the mortgage after acceleration, and (6) that Grantor has the right to bring a court action to assert the nonexistence of a default or any other defense Grantor has to acceleration and sale. If the default is not cured on or before the date specified in the notice, without further demand, Lender shall have the right to declare the entire Indebtedness immediately due and payable and shall have the right to foreclose Grantor's interest in all or any part of the Property by invoking the power of sale, by obtaining a judicial decree of foreclosure, or by any other means permitted by applicable law. If Lender invokes the power of sale, Lender shall serve any person in possession of the Property with a copy of the notice of sale, and Lender shall publish a notice of sale. The Property shall be sold at public auction in the manner prescribed by the statutes of Minnesota. Lender, or someone designated by Lender, may purchase the Property at any sale. Lender shall apply the proceeds of the sale of the Property as follows: (1) to reimbursement of Lender's expenses incurred in connection with the sale of the Property, including, but not limited to Lender's attorneys' fees and court costs allowed by law, (2) to the payment of the Indebtedness, and (3) any excess funds to be paid to Grantor or to any other person or persons legally entitled to such excess proceeds.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code. If notice to Grantor of the intended disposition of the Personal Property is required by law in a particular instance, such notice shall be deemed commercially reasonable if given to Grantor at least ten (10) calendar days prior to the date of intended disposition. Grantor shall pay on demand all costs and expenses, including but not limited to reasonable attorneys' fees and legal expenses, incurred by Lender in exercising these rights and remedies.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender will give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of Grantor's obligations under this Mortgage, after Grantor's failure to do so, that decision by Lender will not affect Lender's right to declare Grantor in default and to exercise Lender's remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

## MORTGAGE
(Continued)

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any person may change his or her address for notices under this Mortgage by giving formal written notice to the other person or persons, specifying that the purpose of the notice is to change the person's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors. It will be Grantor's responsibility to tell the others of the notice from Lender.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** What is written in this Mortgage and in the Related Documents is Grantor's entire agreement with Lender concerning the matters covered by this Mortgage. To be effective, any change or amendment to this Mortgage must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Grantor's Copy of Documents.** Lender agrees to provide Grantor with a conformed copy of both the Credit Agreement and this Mortgage at the time they are executed or within a reasonable time after request.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Minnesota without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Minnesota.

**No Waiver by Lender.** Grantor understands Lender will not give up any of Lender's rights under this Mortgage unless Lender does so in writing. The fact that Lender delays or omits to exercise any right will not mean that Lender has given up that right. If Lender does agree in writing to give up one of Lender's rights, that does not mean Grantor will not have to comply with the other provisions of this Mortgage. Grantor also understands that if Lender does consent to a request, that does not mean Grantor will not have to get Lender's consent again if the situation happens again. Grantor further understands that just because Lender consents to one or more of Grantor's requests, that does not mean Lender will be required to consent to any of Grantor's future requests. Grantor waives presentment, demand for payment, protest, and notice of dishonor.

**Severability.** If a court finds that any provision of this Mortgage is not valid or should not be enforced, that fact by itself will not mean that the rest of this Mortgage will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Mortgage even if a provision of this Mortgage may be found to be invalid or unenforceable.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage:

**Borrower.** The word "Borrower" means Janette L Fairbanks and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated July 30, 2012, **with credit limit of $16,500.00** from Grantor to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of the Credit Agreement is July 30, 2016. NOTICE TO GRANTOR: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto, or common law, and shall also include pollutants, contaminants, polychlorinated biphenyls, asbestos, urea formaldehyde, petroleum and petroleum products, and agricultural chemicals.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Existing Indebtedness.** The words "Existing Indebtedness" mean the indebtedness described in the Existing Liens provision of this Mortgage.

**Grantor.** The word "Grantor" means Janette L Fairbanks.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic

**MORTGAGE**
(Continued)

Page 7

substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means Platinum Bank, its successors and assigns. The words "successors or assigns" mean any person or company that acquires any interest in the Credit Agreement.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _Janette L Fairbanks_
Janette L Fairbanks

This Mortgage was drafted by:

Krista Kook, Relationship Banking Manager/AVP
Platinum Bank
7667 10th St N
Oakdale, MN 55128

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _Minnesota_ )
) SS
COUNTY OF _Washington_ )

On this day before me, the undersigned Notary Public, personally appeared **Janette L Fairbanks, as a single person,** to me known to be the individual described in and who executed the Mortgage, and acknowledged that he or she signed the Mortgage as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this _30th_ day of _July_, 20_12_.

By _____  Residing at _Oakdale MN_

Notary Public in and for the State of _Minnesota_  My commission expires _1/31/2013_

**MORGAGE**
**(Continued)**

Page 8

LASER PRO Lending, Ver. 5.60.10.006    Copr. Harland Financial Solutions, Inc. 1997, 2012.    All Rights Reserved.    - MN
H:\HARLAND\CFI\LPL\G03.FC  TR-1013  PR-8

## EXHIBIT 'A'

Except the North 100.00 feet thereof; the East 125.00 feet of the West 155.00 feet of that part of the Northeast Quarter of the Northeast Quarter of Section 27, Township 29, Range 22, described as follows: Beginning at a point distant 33.00 feet West of the East line of said Section 27 and distant 805.10 feet South of the North line of said Section 27; thence running West 295.76 feet to a point distant 805.50 feet South of said North line; thence South 146.82 feet to a point distant 328.84 feet West of said East line; thence East 295.84 feet to a point distant 147.25 feet South of point of beginning; thence North 147.26 feet to point of beginning, all according to the United States Government Survey thereof, Ramsey County, Minnesota.



# EXHIBIT 3



Doc No **A04629633**

Certified, filed and/or recorded on
Oct 19, 2016 11:24 AM

Office of the County Recorder
Ramsey County, Minnesota
Susan R Roth, County Recorder
Christopher A. Samuel, County Auditor and Treasurer

Deputy 704                                        Pkg ID 1154474E

| Document Recording Fee Abstract | $46.00 |
|---|---|
| *Document Total* | $46.00 |

This cover sheet is now a permanent part of the recorded document.

## MODIFICATION OF MORTGAGE

RECORDATION REQUESTED BY:
Platinum Bank
Main office
7667 10th St N
Oakdale, MN 55128

WHEN RECORDED MAIL TO:
Platinum Bank
Main office
7667 10th St N
Oakdale, MN 55128

SEND TAX NOTICES TO:
Platinum Bank
Main office
7667 10th St N
Oakdale, MN 55128

---

NOTICE: This is a mortgage amendment, as defined in Minnesota Statutes, Section 287.01, Subdivision 2, and as such it does not secure a new or an increased amount of debt.

THIS MODIFICATION OF MORTGAGE dated July 30 2016, is made and executed between Janette L Fairbanks, as a single person (referred to below as "Grantor") and Platinum Bank, whose address is 7667 10th St N, Oakdale, MN 55128 (referred to below as "Lender").

MORTGAGE. Lender and Grantor have entered into a Mortgage dated July 30, 2012 (the "Mortgage") which has been recorded in Ramsey County, State of Minnesota, as follows:

Recorded on August 30, 2012, as document number 4354341 in the Office of the County Recorder in and for Ramsey County MN.

REAL PROPERTY DESCRIPTION. The Mortgage covers the following described real property located in Ramsey County, State of Minnesota:

See See Exhibit A, which is attached to this Modification and made a part of this Modification as if fully set forth herein.

The Real Property or its address is commonly known as 1112 Breen St, Saint Paul, MN 55106. The Real Property tax identification number is 27-29-22-11-0022.

MODIFICATION. Lender and Grantor hereby modify the Mortgage as follows:

The maturity date shall be extended to July 30, 2017.

CONTINUING VALIDITY. Except as expressly modified above, the terms of the original Mortgage shall remain unchanged and in full force and effect and are legally valid, binding, and enforceable in accordance with their respective terms. Consent by Lender to this Modification does not waive Lender's right to require strict performance of the Mortgage as changed above nor obligate Lender to make any future modifications. Nothing in this Modification shall constitute a satisfaction of the promissory note or other credit agreement secured by the Mortgage (the "Note"). It is the intention of Lender to retain as liable all parties to the Mortgage and all parties, makers and endorsers to

## MODIFICATION OF MORTGAGE
### (Continued)

the Note, including accommodation parties, unless a party is expressly released by Lender in writing.  Any maker or endorser, including accommodation makers, shall not be released by virtue of this Modification.  If any person who signed the original Mortgage does not sign this Modification, then all persons signing below acknowledge that this Modification is given conditionally, based on the representation to Lender that the non-signing person consents to the changes and provisions of this Modification or otherwise will not be released by it.  This waiver applies not only to any initial extension or modification, but also to all such subsequent actions.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MODIFICATION OF MORTGAGE AND GRANTOR AGREES TO ITS TERMS.  THIS MODIFICATION OF MORTGAGE IS DATED JULY 30 2016.

GRANTOR:

X _____
Janette L Fairbanks

LENDER:

PLATINUM BANK

X _____
Kristin Draeger, Relationship Banking Supervisor

This Modification of Mortgage was drafted by:

Kristin Draeger, Relationship Banking Supervisor
Platinum Bank
7667 10th St N
Oakdale, MN 55128

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF ___Minnesota___          )
                                  ) SS
COUNTY OF ___Washington___        )

LESLIE ANN BOOTZ
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2020

On this day before me, the undersigned Notary Public, personally appeared Janette L Fairbanks, as a single person, to me known to be the individual described in and who executed the Modification of Mortgage, and acknowledged that he or she signed the Modification as his or her free and voluntary act and deed, for the uses and purposes therein mentioned.

Given under my hand and official seal this ___13 th___ day of ___October___, 20 __16__.

By _____          Residing at ___St. Louis Park, MN___

Notary Public in and for the State of ___MN___          My commission expires ___1-31-20___

## MODIFICATION OF MORTGAGE
### (Continued)

Page 3

---

### LENDER ACKNOWLEDGMENT

STATE OF _Minnesota_                    )
                                        ) SS
COUNTY OF _Washington_                  )

*LESLIE ANN BOOTZ*
*NOTARY PUBLIC*
*MINNESOTA*
*My Commission Expires Jan. 31, 2020*

On this ___13th___ day of ___October___, 20 _16_, before me, the undersigned Notary Public, personally appeared Kristin Draeger and known to me to be the Relationship Banking Supervisor, authorized agent for Platinum Bank that executed the within and foregoing instrument and acknowledged said instrument to be the free and voluntary act and deed of Platinum Bank, duly authorized by Platinum Bank through its board of directors or otherwise, for the uses and purposes therein mentioned, and on oath stated that he or she is authorized to execute this said instrument and in fact executed this said instrument on behalf of Platinum Bank.

By _Leslie Bootz_                       Residing at _St Louis Park, MN_

Notary Public in and for the State of _MN_     My commission expires _1-31-20_

---

LaserPro, Ver. 16.2.10.016  Copr. D+H USA Corporation 1997, 2016.   All Rights Reserved.   - MN  H:\HARLAND\CFI\LPL\G201.FC
TR-1013 PR-8

EXHIBIT 'A'

Except the North 100.00 feet thereof; the East 125.00 feet of the West 155.00 feet of that
part of the Northeast Quarter of the Northeast Quarter of Section 27, Township 29, Range
22, described as follows: Beginning at a point distant 33.00 feet West of the East line of said
Section 27 and distant 805.10 feet South of the North line of said Section 27; thence running
West 295.76 feet to a point distant 805.50 feet South of said North line; thence South
146.82 feet to a point distant 328.84 feet West of said East line; thence East 295.84 feet to a
point distant 147.25 feet South of point of beginning; thence North 147.26 feet to point of
beginning, all according to the United States Government Survey thereof, Ramsey County,
Minnesota.

# EXHIBIT 4

## CREDIT AGREEMENT AND DISCLOSURE CHANGE IN TERMS AGREEMENT

| Principal $16,500.00 | Loan Date 07-30-2012 | Maturity 07-30-2017 | Loan No 8001826 | Call / Coll | Account | Officer KED | Initials |
|---|---|---|---|---|---|---|---|
| References in the boxes above are for our use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "* * *" has been omitted due to text length limitations. | | | | | | | |

Borrower:  Janette L Fairbanks
1112 Breen St
Saint Paul, MN  55106

Lender:  Platinum Bank
Main office
7667 10th St N
Oakdale, MN  55128

---

CREDIT LIMIT: $16,500.00

DATE OF AGREEMENT:  July 30 2016

**Description of Existing Indebtedness.** This agreement is an amendment of that certain Credit Agreement and Disclosure dated July 30, 2012, identified with lender as Loan Number 8001826, in the original principal amount of Sixteen Thousand Five Hundred 00/100 dollars ($16,500.00) ("Credit Agreement"), issued by the Borrower and payable to the order of the Lender, and is not in payment thereof.

**Description of Collateral.** Borrower acknowledges that the above described Credit Agreement, is secured by the following collateral described in the security instrument listed herein:  A Mortgage dated July 30, 2012, recorded on August 30, 2012, as document number 4354341, in the amount of Sixteen Thousand Five Hundred 00/100 dollars ($16,500), in the office of the County Recorder in and for Ramsey County MN, encumbering real property located at 1112 Breen St, St Paul MN 55106.

**Description of Change In Terms.** Borrower acknowledges that the terms of the above-described Credit Agreement as amended by this Agreement shall be changed as follows:

(A)  The maturity date shall be changed from July 30, 2016 to July 30, 2017.

(B)  The section entitled "Credit Limit" shall be deleted in its entirety and no further advances shall be allowed.

(C)  The section entitled "Credit Advances" shall be deleted in its entirety and no further advances shall be allowed.

**Continuing Validity.** Except as expressly changed by this Agreement, the terms of the original obligation or obligations, including all agreements evidenced or securing the obligation(s), remain unchanged and in full force and effect.  Consent by us to this Agreement does not waive our right to strict performance of the obligation(s) as changed, nor obligate us to make any future change in terms.  Nothing in this Agreement will constitute a satisfaction of the obligation(s).  It is the intention of us to retain as liable parties all makers and endorsers of the original obligation(s), including accommodation parties, unless a party is expressly released by us in writing.  Any maker or endorser, including accommodation makers, will not be released by virtue of this Agreement.  If any person who signed the original obligation does not sign this Agreement below, then all persons signing below acknowledge that this Agreement is given conditionally, based on the representation to us that the non-signing party consents to the changes and provisions of this Agreement or otherwise will not be released by it.  This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement.  By signing this Agreement, you acknowledge that you have read this Agreement.

**Section Disclosure.** To the extent not preempted by federal law, this loan is made under Minnesota Statutes, Section 47.59.

BORROWER:

X _Janett Fairbanks_____
Janette L Fairbanks

ACCEPTED: PLATINUM BANK

By: _Kristin Draeger_____
Kristin Draeger, Relationship Banking Supervisor

LaserPro, Ver. 16.3.10.016  Copr. D + H USA Corporation 1997, 2016.  All Rights Reserved.  - MN  H:\APL\LANDIC\FIL\FL\D25.FC  TR-1013  PR-9

# EXHIBIT 5

Doc No **A04685814**

Certified, filed and/or recorded on
Nov 14, 2017 9:12 AM

Office of the County Recorder
Ramsey County, Minnesota
Susan R Roth, County Recorder
Christopher A. Samuel, County Auditor and Treasurer

Deputy 309                                         Pkg ID 1218833E

Document Recording Fee Abstract                    $46.00

*Document Total*                                   $46.00

This cover sheet is now a permanent part of the recorded document.

## ASSIGNMENT OF MORTGAGE

**THIS ASSIGNMENT OF MORTGAGE** ("Assignment") is made this 27 day of September, 2017, by and between Platinum Bank, a Minnesota banking corporation ("Assignor"), and NJC Holdings LLC, a Minnesota limited liability company ("Assignee").

### RECITALS

A.      Janette L. Fairbanks ("Borrower"), executed that certain mortgage, in favor of Assignor, dated July 30, 2012, and recorded on August 30, 2012, as Document No. 4354341, as modified by that certain modification of mortgage dated July 30, 2016, and recorded on October 19, 2016, as Document No. A04629633, both in the Office of the County Recorder in and for Ramsey County, Minnesota (collectively, "Mortgage").

B.      The Mortgage currently encumbers certain real property located in Ramsey County and legally described on **Exhibit "A"**, attached hereto and made a part hereof ("Property").

C.      Unless otherwise defined herein, all capitalized terms used in this Assignment shall have the same meanings as defined in the Mortgage.

D.      Assignor desires to assign the Mortgage to the Assignee.

**NOW, THEREFORE,** in consideration of the above-stated recitals, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.      The above-stated recitals are true and correct and are incorporated herein by reference.

2.      The Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title and interest in, to and arising out of the Mortgage referenced herein, without recourse (except as set forth in that certain agreement for assignment of loan documents executed of even

date herewith), representation or warranty of any kind to Assignor, except as specifically set forth herein.

3.    The parties hereto agree that the Assignee shall be assigned the Mortgage referenced herein, that the Assignee shall be subject to the obligations, terms and conditions of the Mortgage and that Assignee agrees to perform and be bound by the same in accordance with the terms and conditions set forth therein.

4.    This Assignment is delivered in and made and shall in all respects be governed and construed according to the laws of the State of Minnesota.

**IN WITNESS WHEREOF,** the parties have executed this Assignment as of the date first above written.

THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK AND THE FOLLOWING PAGES ARE THE SIGNATURE AND NOTARY PAGES AND EXHIBIT "A".

**Platinum Bank**
(a Minnesota banking corporation)

By: _____

Steven R. Marchek
Its: Senior Vice President

STATE OF MINNESOTA     )
                       ) SS
COUNTY OF _Washington_ )

The foregoing instrument was acknowledged before me this _27_ day of September _27_, 2017, by Steven R. Marchek, the Senior Vice President of Platinum Bank, a Minnesota banking corporation, on behalf of the banking corporation.

MARC COVE
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2020

_____
Notary Public

This is a signature and notary page to that certain Assignment of Mortgage dated September_____, 2017.

3

NJC Holdings LLC
(a Minnesota limited liability company)

By: _____

Name: _PAUL BRUGGEMAN_

Its: _CHIEF MANAGER_


STATE OF MINNESOTA        )
                          ) SS
COUNTY OF _WASHINGTON_    )

    The foregoing instrument was acknowledged before me this _27_ day of September, 2017, by _Paul Bruggeman_____, the _Chief M&A_____ of NJC Holdings LLC, a Minnesota limited liability company, on behalf of the limited liability company.

MARC COVE
NOTARY PUBLIC
MINNESOTA
My Commission Expires Jan. 31, 2020

_____
Notary Public


THIS INSTRUMENT WAS DRAFTED BY:
ANASTASI JELLUM, P.A.
14985 60th Street North
Stillwater, MN 55082
(651) 439-2951
JDC/16876


This is a signature and notary page to that certain Assignment of Mortgage dated September_____, 2017.

4

EXHIBIT "A"

LEGAL DESCRIPTION

The following described real property located in the County of Ramsey, and State of Minnesota:

Except the North 100.00 feet thereof; the East 125.00 feet of the West 155.00 feet of that part of the Northeast Quarter of the Northeast Quarter of Section 27, Township 29, Range 22, described as follows: Beginning at a point distant 33.00 feet West of the East line of said Section 27 and distant 805.50 feet South of said North line; thence South 146.82 feet to a point distant 328.84 feet West of said East line; thence East 295.84 feet to a point distant 147.25 feet South of a point of beginning; thence North 147.26 feet to a point of beginning, all according to the United States Government Survey thereof, Ramsey County, Minnesota.

This is Exhibit "A" to that certain Assignment of Mortgage dated September _____, 2017.

**RAMSEY COUNTY**

## Pay Property Tax

Pay Property Taxes

## Summary View

| | |
|---|---|
| Parcel ID | 272922110022 |
| Parcel Status | Active |
| Property Address | 1112 BREEN ST |
| | ST PAUL, MN 55106-2909 |
| Sec/Twp/Rng | 27/029/022 |
| Brief Tax Description | SECTION 27 TOWN 29 RANGE 22 |
| | S 47 34/1OO FT MOL OF N 952 44/1OO FT MOL OF W 125 FT OF PART OF NE 1/4 E OF BREEN AVE IN SEC 27 TN 29 RN 22 |
| | (Note: Not to be used on legal documents) |
| Parcel Area | 0.13 Acres |
| Parcel Width | 47 Feet |
| Parcel Depth | 125 Feet |
| | (Note: Width and Depth represent buildable area of lot in the case of irregularly shaped lots) |
| Tax Classification | 1A-Residential Homestead |
| Roll Type | Real Property |
| Municipality | ST PAUL |
| School District | ISD #625 |
| Watershed | METRO WATERSHED |
| TIF District | |
| Land Use Code | 510 R - SINGLE FAMILY DWELLING, PLATTED LOT |

\* The Tax Classification is the Assessor Office's determination of the use of the property and is not the same as the property's zoning.

\* Please contact the zoning authority for information regarding zoning.

\* To determine whether your property is Abstract or Torrens, call 651-266-2050

## Taxpayers

Please refer to disclaimer at bottom of this page

| Type | Name | Address |
|---|---|---|
| Owner | Janette L Fairbanks | 1112 Breen St |
| | | St Paul MN 55106-2909 |

## Current Tax Year

\*Information listed is as of yesterday. For specific payoff information contact Property Tax Info at 651-266-2000

| First Half Due 05-15-2018 | | Second Half Due 10-15-2018 | |
|---|---|---|---|
| Amount Due | $1,050.00 | Amount Due | $1,050.00 |
| Penalty & Fees (thru current month) | $84.00 | Penalty & Fees (thru current month) | $0.00 |
| Sub Total | $1,134.00 | Sub Total | $1,050.00 |
| Payments Made | $0.00 | Payments Made | $0.00 |
| Balance Due | $1,134.00 | Balance Due | $1,050.00 |

**Total Due  $2,184.00**

## Tax Summary

| | | 2018 Payable | 2017 Payable | 2016 Payable | 2015 Payable | 2014 Payable |
|---|---|---|---|---|---|---|
| | Estimated Market Value | $138,300 | $116,500 | $115,700 | $107,000 | $88,900 |
| | Taxable Market Value | $113,500 | $89,700 | $88,900 | $79,400 | $59,700 |
| + | Net Tax Amount | $1,898.46 | $1,479.76 | $1,519.71 | $1,375.12 | $1,115.66 |
| + | Special Assessments | $201.54 | $336.24 | $564.29 | $316.88 | $308.34 |
| = | **Total Taxes** | **$2,100.00** | **$1,816.00** | **$2,084.00** | **$1,692.00** | **$1,424.00** |
| + | Penalty | $84.00 | $181.60 | $208.40 | $169.20 | $0.00 |
| + | Interest | $0.00 | $121.24 | $362.96 | $480.80 | $0.00 |
| + | Fees | $0.00 | $80.93 | $0.00 | $0.00 | $0.00 |
| - | Amount Paid | $0.00 | $2,199.77 | $2,655.36 | $2,342.00 | $2,161.65 |
| = | **Outstanding Balance** | **$2,184.00** | **$0.00** | **$0.00** | **$0.00** | **$0.00** |

## Special Assessments

Note: + sign indicates a multiple year assessment. Click on the + to view additional years.

| Assess # | Year | Description | Initial Amount | Principal | Interest | Installment Amount | Remaining Balance | Deferred |
|---|---|---|---|---|---|---|---|---|
| R-011899960 | 2018 | 2018 Recycling & Solid Waste | $0.00 | $0.00 | $0.00 | $82.80 | $0.00 | No |
| T-011700250 | 2018 | 2017 SMSP / Street Maintenance | $0.00 | $0.00 | $0.00 | $23.50 | $0.00 | No |
| T-011700800 | 2018 | 2017 SSC / Storm Sewer | $0.00 | $0.00 | $0.00 | $95.24 | $0.00 | No |

Note: Installment amount is the amount that will be included in the property tax total for the referenced payable year.
Remaining Balance is the amount eligible for prepayment. Prepayment must be paid in full by November 15th of the current year.
Please call the City of Saint Paul General Assessment line for payoff amounts or additional information concerning any Saint Paul assessment. You can reach them at 651-266-8858 or go to Assessment Lookup.

Suburban property owners should call 651-266-2000 for detailed assessment information.

## Tax Transaction History

| Tax Year | Business Date | Effective Date | Transaction Type | Tax Amount | Special Assessment | Penalty | Interest | Fees | Overpayment | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| 2018 | 2/28/2018 | | Original Charge | $1,898.46 | $201.54 | $0.00 | $0.00 | $0.00 | $0.00 | $2,100.00 |
| 2017 | 7/24/2018 | 7/24/2018 | Payment | ($1,479.76) | ($336.24) | ($181.60) | ($121.24) | ($80.93) | $0.00 | ($2,199.77) |
| 2017 | 6/4/2018 | | Charge Adjustment | $0.00 | $0.00 | $0.00 | $0.00 | $6.67 | $0.00 | $6.67 |
| 2017 | 5/4/2018 | | Charge Adjustment | $0.00 | $0.00 | $0.00 | $0.00 | $70.00 | $0.00 | $70.00 |
| 2017 | 5/3/2018 | | Charge Adjustment | $0.00 | $0.00 | $0.00 | $0.00 | $4.26 | $0.00 | $4.26 |
| 2017 | 2/19/2017 | | Original Charge | $1,479.76 | $336.24 | $0.00 | $0.00 | $0.00 | $0.00 | $1,816.00 |
| 2016 | 7/24/2018 | 7/24/2018 | Payment | ($1,519.71) | ($564.29) | ($208.40) | ($362.96) | $0.00 | $0.00 | ($2,655.36) |
| 2016 | 2/15/2016 | | Original Charge | $1,519.71 | $564.29 | $0.00 | $0.00 | $0.00 | $0.00 | $2,084.00 |

## Sales

| Date | eCRV # | Sale Price | State Study Recommendation | State Study Reject Reason | Cnty Stdy Rec |
|---|---|---|---|---|---|
| 12/15/1995 | | $65,000 | Y | | Y |
| 2/15/1996 | | $65,000 | Y | | Y |
| 4/13/2006 | | $175,000 | Y | | Y |
| 8/8/2008 | | $98,000 | N | 08-CORRECTION DEED | N |

## Pay Property Tax

Pay Property Taxes

## Statements and Notices

2018
Value Notice
Tax Statement
Payment Stubs
Proposed Tax Statement

2017
Value Notice
Tax Statement
Payment Stubs
Proposed Tax Statement

2016
Value Notice
Tax Statement

2015
Value Notice
Tax Statement

2014
Value Notice
Tax Statement

2013
Value Notice
Tax Statement

**State of Minnesota**

The Property Tax Refund Program is administered by the State of Minnesota. For information regarding the program, please call 651-296-3781 or visit the website here

Form M1PR(Property Tax Refund)

**No data available for the following modules:** Multi-Parcel Link, Delinquent Taxes, Service Company and Lender.

The information in this web site represents current data from a working file which is updated daily (see Last Data Upload at bottom of page for the timing of the last update). Information is believed reliable, but its accuracy cannot be guaranteed. No warranty, expressed or implied, is provided for the data herein, or its use.

Last Data Upload: 10/17/2018 6:02:58 AM

Developed by



**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF MINNESOTA**

In re:                                    Case No. 18-32482

Jannette Lee Fairbanks,                   Chapter 13 Bankruptcy

    Debtor.

## VERIFICATION

I, Paul Bruggeman, principal of NJC Holdings LLC, the creditor in this case and the movant named in the foregoing documents, declare under penalty of perjury that I have read the Objection of NJC Holdings LLC to Plan Confirmation (along with all attachments and exhibits) and that the facts contained therein are true and correct to the best of my knowledge, information and belief.

Dated: 10/18/18

Paul Bruggeman

4827-4475-0456, v. 1

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF MINNESOTA

In re:                                    Case No. 18-32482

Janette Lee Fairbanks,                    Chapter 13 Bankruptcy

     Debtor.

# ORDER DENYING CONFIRMATION

This matter came before this Court for hearing seeking confirmation of Debtor's Chapter 13 Plan.

Appearances were noted in the record.

Having reviewed the files and records herein, the Objection to the Confirmation, and the testimony of the witnesses, etc.:

It is hereby adjudged that confirmation of Debtor's Chapter 13 Plan be DENIED.

Dated:                          _____

                                   William J. Fisher
                                   United States Bankruptcy Judge

4822-0596-8761, v. 1